IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROSS COOK, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:14-cv-00371 |
| ) | Senior Judge Haynes |
| v. ) | |
| ) | |
| LIFE CREDIT UNION, ) | |
| ) | |
| Defendant. ) | |

**M E M O R A N D U M**

Plaintiff, Ross Cook, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as amended, the Tennessee Human Rights Act, Tenn. Code. Ann. § 4-21-101 et seq., the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12117, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 against Defendant, Life Credit Union, Plaintiff's former employer. Plaintiff's claims arise out of his termination that he contends was discriminatory because of his gender and his disability. Plaintiff also asserts claims for sexual harassment and retaliation.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 18), contending, in sum, that Plaintiff's proof fails to establish his claims, and that even if Plaintiff's claims were proven, Defendant can show a non-discriminatory reason for Plaintiff's termination. In response, Plaintiff asserts that his evidence is sufficient to support his claims. (Docket Entry No. 27). In his response, Plaintiff also concedes his disability discrimination claims.

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 18) should be granted because Plaintiff's proof fails to meet the standards for a judgment on his claims.

## A. Findings of Fact[1]

Defendant is a credit union with its offices in Nashville, Tennessee. (Docket Entry No. 1, Complaint at 1).[2] At the time of Plaintiff's employment, Pam Tenpenny was Defendant's Chief Executive Officer, and Benita Harp was Defendant's Chief Operating Officer. (Docket Entry No. 21-2, Tenpenny Affidavit, at ¶ 1; Docket Entry No. 21-3, Harp Affidavit, at ¶ 1). Harp had complete authority to hire and fire employees without Tenpenny's authorization. (Docket Entry No. 27-1, Tenpenny Deposition, at p. 9).

On November 29, 2012, Defendant sent a letter offering Plaintiff the position of Branch Manager. (Docket Entry No. 21-4). This was a new position and the offer letter stated that "[Plaintiff's] first 90 days of employment with the credit union are considered an introductory period. Completion of this introductory period does not guarantee continued employment for any specified period of time, nor does it require that a termination be based on 'cause.'" (Docket Entry No. 21-1, Cook Deposition, at pp. 38-39; Docket Entry No. 21-4, Offer Letter, at 2). Plaintiff accepted the Defendant's offer on November 30, 2012 and began work on January 2, 2013. (Docket Entry No. 21-4 at 4, 3).

Plaintiff's direct supervisor was Christa Elliot. Id. at 2. During the introductory period,

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes a finding of facts.

[2]The Court's citations are to the pagination in the Court's electronic case filing system. The Court's citations denoted by a "p." refer to the pagination of a deposition.

Plaintiff was trained primarily by Christy Skinner. (Docket Entry No. 21-1 at p. 67). Plaintiff immediately began complaining about his training. "At first ... [Skinner] would try to train me some. It was hit or miss[.]" Id. During his first week of work, Plaintiff was included on an email from a client that indicated that Plaintiff worked in collections. Id. at p. 68. Skinner worked in collections, and Plaintiff describes Skinner as angry that Plaintiff was included on the email. Id. at pp. 68, 73-74. Tenpenny approached Plaintiff and told him to disregard the email and that Skinner could handle the duties of collections. Id. at p. 71. Skinner agreed that Tenpenny spoke to Plaintiff regarding responsibilities for collections, but denies that she confronted Plaintiff about the email. (Docket Entry No. 27-5, Skinner Deposition, at pp. 25-26). There were not any further conversations about the email. (Docket Entry No. 21-1 at p.74-75).

Plaintiff asserts that after this email, his relationship with Skinner "started going down." Id. at p. 68. Plaintiff asserts that Skinner would ignore him, give "short answers" and "tell [him] she would be in there in a minute to help [him]," but would "never come." Id. at p. 69. After the conversation regarding the email, Skinner would train Plaintiff a "[l]ittle bit." Id. at p. 75. Life Credit Union's computer system differed from the system of Plaintiff's prior credit union. Id. at p. 76. Plaintiff agreed that he had a "[b]ig learning curve." Id. at p. 77. Skinner also acknowledged that learning the system required extra work and "getting used to it." (Docket Entry No. 27-5 at p. 31).

Plaintiff utilized an office guide book and online training to learn the Defendant's computer system. (Docket Entry No. 21-1 at pp. 77-78). Plaintiff did not find these helpful and preferred to be trained in person on the operation of the Defendant's computer system. Id. at p. 88. Plaintiff also asked other employees for help when he needed it immediately. Id. at p. 79. In

3

late January or early February, Elliot told Skinner that Plaintiff "fe[lt] as if [Skinner had] been ignoring him." (Docket Entry No. 27-5 at p. 36). Skinner and Elliot immediately called Plaintiff into Elliot's office to discuss the issue. Id. at pp. 36-37. Plaintiff stated that his "primary problem [with Skinner was] the training." (Docket Entry No. 21-1 at p. 80).

By February, Plaintiff considered his job in jeopardy. (Docket Entry No. 21-1 at pp. 96-97). Elliot and Harp came into Plaintiff's office "almost a (sic) weekly." Id. at p. 97. Once, Harp asked him why he should remain in his position.[3] Id. at pp. 97-98 Plaintiff requested a meeting with Harp to answer his question. Id. at p. 98. Plaintiff "felt like no one was willing to train [him] because they didn't feel there was a reason." Id. According to Harp, all staff completed the same exercise, based on training program at Apple. (Docket Entry No. 27-3, Harp Deposition, at pp. 55-56).

According to Plaintiff, other employees also complained of a lack of training. (Docket Entry No. 21-1 at p. 81). Casey Midgett, a male employee, told Plaintiff that training at Life Credit Union was "basically non-existent" and could take up to six months, and advised Plaintiff to "just stick with it." Id. at pp. 81-82. Plaintiff acknowledged that he was making errors and attributed the errors to the lack of training. Id. at p. 99. Within six weeks of starting the job,

---

[3]Either the transcript of the deposition is incorrect, or Plaintiff raised the "why" issue:
A: ... I asked her why I need to stay there.
Q: Is that the why statement?
A: Yes.
Q: Okay.
A: So she – asked me to do that. Nervous, anxious about it in situation go home prepare, trying to figure out everything I can do. I think for a week she walked by my office without even looking at me to question the question.
    I had to ask her to meet with me again to finally give her the why I guess since I needed to save my job. Didn't seem very important to her after that.
(Docket Entry No. 21-1 at p. 97-98).

4

Plaintiff believed that he would be terminated. Id. at p. 129. Plaintiff expressed his concerns to Tenpenny once and to Harp once or twice. Id. at p. 82. Plaintiff also emailed Elliot about lack of training. Id. at p. 99.

According to Plaintiff, he was called into Elliot's office in mid-February where Elliot asked Plaintiff "do you work out" and "how big are your arms." Id. at pp. 101-02. Plaintiff testified that Elliot remarked, "I bet you have huge biceps." Id. at p. 102. Skinner, who was present, purportedly stated, "you can tell he works out. Look at his shoulders in that shirt." Id. at p. 106. Plaintiff did not respond to these comments. Id. According to Plaintiff, Elliot grabbed Plaintiff's arm, laughed, and said "don't turn me in or make a big deal about it." Id.

According to Elliot, Plaintiff was not called into the office, "[h]e just came in, conversation" and Plaintiff asked about Elliot's weight loss program. (Docket Entry No. 27-2, Elliot Deposition, at pp. 42-43). Elliot stated that Plaintiff's question "ultimately led to [a conversation about] working out." Id. Elliot stated that she did touch Plaintiff, but that she "did not just reach over and grab him. And this is uncharacteristic of me, but I said, Ross, can I feel your bicep? I asked permission. He stated, yes. ... He stated, yes, stood up, leaned over my desk, and flexed." Id. at pp. 44-45. Elliot stated that she did not tell Plaintiff "not to make a big deal about it" or "not to report [her]." Id. at pp. 46-47. Skinner described Elliot's touching of Plaintiff as follows:

> [S]he asked – she asked for permission to touch his – because he said he had been working with weights. So she asked – she asked him for his permission to touch his bicep. ... She said, do you mind if I touch your bicep? ... And he said, no, and he stood up and reached across the desk and just kind of held his arm out.

(Docket Entry No. 27-5 at p. 45). Skinner also stated that Elliot did not tell Plaintiff not to

mention it to anyone nor did Elliot consider the touching inappropriate. Id. Plaintiff did not report the incident to Harp or to Tenpenny because "they worked together for years. They're very close." (Docket Entry No. 21-1 at pp. 111-12). Plaintiff did not believe they "would actually do anything besides maybe run and tell the other and laugh about it." Id. at p. 112.

After this incident, Plaintiff stated his training "wasn't getting any better." Id. at p. 113. "It was almost like [Plaintiff] would go weeks without anybody coming in to see if they could help [him] learn anything." Id. Plaintiff stated his training "was never satisfactory," even before this touching incident. Id.

After this touching incident, sometime around Easter, a gay customer of Defendant visited the Defendant's office with gifts for the staff. Id. at p. 115. Becky Cheatham, a co-employee, told Plaintiff in the presence of other employees that this customer asked if Plaintiff were gay because "he thinks you're hot." Id. at pp. 115-16. Cheatham and the other employees laughed and Plaintiff responded that he "didn't want to hear it" and asked the employees to "drop it. I don't want to hear about it." Id. at pp. 116-17. Plaintiff states that Cheatham continued to "kind of joke about it" two or three times. Id. at p. 118. Later that day, Cheatham came into Plaintiff's office to inform Plaintiff that 'Benita called me and said that you could file a complaint, so, I'm going to drop it.'" Id.

The parties disagree about Elliot's involvement in this incident. Plaintiff asserts that later that day Elliot came into his office, leaned over his shoulder and told him "looks like [the customer] has the hots for you." Id. Plaintiff responded that he was not interested. Id. According to Elliot, she did speak with Plaintiff later, but did not say "[customer] has the hots for you," as that "doesn't sound like really [her] vocabulary." (Docket Entry No. 27-2 at p. 75).

Instead, Elliot said, "I understand that [customer] has shown interest in you. If he makes you feel uncomfortable, you do not have to wait on him." Id. Further, Elliot asserts that while at the teller window, Skinner told Plaintiff that he did not "have to wait on [the customer] ... if [Plaintiff was] not comfortable" to which Plaintiff replied that he would be fine "as long as [the customer] doesn't touch [him]." Id. at p. 74. Elliot also testified that when she became aware of Cheatham's comments, she "told [Cheatham], you know, go ahead and go back out front but do not say any more about this." Id.

According to Elliot, after Plaintiff left for the day, Elliot addressed the other employees and said "okay, we all know [customer] has shown interest in [Plaintiff]. We do not need to have conversation about this anymore." Id. at p. 75. Elliot did not report the incident to Harp or Tenpenny, because Elliot believed that Cheatham had already reported it. Id. at pp. 76, 77. Regarding the incident, Plaintiff testified that "[i]t [was] embarrassing especially in a position as a Branch Manager you got your staff basically laughing and joking about an uncomfortable situation." (Docket Entry No. 21-1 at p. 120). Yet, Plaintiff did not report the incident to Harp or to Tenpenny. Id. at pp. 120-21.

Plaintiff stated that there were no other incidents of sexual harassment, or incidents that made him feel uncomfortable or were otherwise inappropriate. Id. at p. 120. Plaintiff acknowledged receiving an employee handbook, but stated that he was not familiar with the sexual harassment policy. Id. at pp. 129-30. Plaintiff admitted that he was familiar with sexual harassment policies generally and that the usual response to harassment was to report the incident to a superior. Id. at p. 130.

The proof includes copies of several text messages. When presented with these text

7

messages, Plaintiff acknowledged that they "[c]ould be" his. Id. at p. 139. Several text messages are from February 18, 2013. Id. These say, "[h]e keeps trying to talk to me. I'm ignoring him;" "[n]o, really I hate everyone;" "[h]oly hell. Where do I work at. Is this real?;" "I had Becky eating in my ear. Fmj."; "[i]t sounded like a snoring pig." (Docket Entry No. 27-4, Cook Deposition, at 140-42, 144). Plaintiff admitted joking to Elliot about a customer who "smelled real bad." (Docket Entry No. 21-1 at pp. 137-38). Plaintiff stated that Elliot laughed about it, but the next day "came in and was furious" about the comment. Id. at p. 138.

Shortly after this incident, Plaintiff had an "unannounced" meeting with Elliot and Harp. Id. at 123. This meeting discussed "job training, performance, things like that that [Plaintiff] had concerns about." Id. Plaintiff felt this conversation was "[v]ery confrontational, aggressive" and made him feel his "job was definitely in jeopardy" so he got "defensive." Id. at 124. As a result of the meeting, in late March, Harp decided to extend Plaintiff's introductory period to 120 days. Id. at 125-26. Plaintiff "[didn't] know" the purpose of extending his introductory period, but guessed that they "were going the try to (sic), you know, get this thing going, get training going, get things up to par." Id. at 126-27. Plaintiff's understanding from the meeting was "why would you extend something unless you were going to try to do something." Id. at 127. Harp stated that she advised Plaintiff that it "did not look promising" that Plaintiff would pass the introductory period due to his inability to learn the system and his comments about other employees and customers. (Docket Entry No. 21-3 at ¶ 7-8).

At the end of March, Harp left the office for vacation. (Docket Entry No. 27-3 at p. 65). On April 1, 2013, when Harp returned to work, she had several meetings about Plaintiff. Id. at pp. 70-71, p. 73, pp. 76-77. Elliot informed Harp via email that Marcey Ward wanted to call a

meeting with both Harp and Elliot to discuss her concerns about Plaintiff. Id. at pp. 70-71. When Harp arrived, but before she could approach Ward, Tenpenny asked to speak with Harp. Id. at p. 72. Tenpenney told her that "[a] lot happened" while she was gone, and that the staff was upset about Plaintiff's behavior. Id. at p. 68. According to Harp, Plaintiff had "said lots of mean and cruel things," especially regarding other employees' "weight, that they were gross and fat and that they were – some of his coworkers thought he was their friend, but the entire time he had been making fun of them behind their backs." Id. at pp. 68-69. Harp stated that Plaintiff had "made a particular employee cry" by saying "how fat she was and she – that he couldn't believe her husband was as good looking as he was and would be with someone as gross as her." Id. at p. 70. After speaking with Tenpenny, Harp called a meeting with Elliot and Ward. Id. at p. 73. Ward reported that she felt uncomfortable around Plaintiff, and claimed that customers would wait for another employee rather than speaking with Plaintiff. Id. at pp. 73-74. Soon after, Harp spoke with Elliot about terminating Plaintiff. Id. at pp. 75-76. On April 1, 2013, Defendant terminated Plaintiff. Id. at 128. The Branch Manager position was not filled after Plaintiff was terminated. (Docket Entry No. 21-2 at p. 135 and Docket Entry No. 21-2 at ¶ 5).

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in original). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex, 477 U.S. at 323 and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must

11

determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . . .
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted).

It is likewise true that:

> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party has "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff has presented sufficient facts

to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law.

As a threshold matter, for Plaintiff's THRA claims, "an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." Lynch v. City of Jellico, 205 S.W.3d 384, 399 (Tenn. 2006). The Tennessee Supreme Court has stated, "our legislature had intended the THRA 'to be coextensive with federal law'... We, however, are neither bound by nor limited by the federal law when interpreting our state's anti-discrimination statute. The policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law." Parker v. Warren Cnty. Util. Dist., 2 S.W.3d 170, 172-73 (Tenn. 1999) (quotations omitted). Thus, Plaintiff's Title VII and THRA claims are analyzed under the same legal framework.

For his Title VII claim for sexual harassment, Plaintiff asserts the "quid pro quo" sexual harassment theory described in Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436 (6th Cir. 2008). Under this test, Plaintiff must show:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

Id. at 441.

Defendants do not address the application of this test to Plaintiff's claims. Plaintiff also does not sufficiently address this test. Plaintiff does not present any facts to show that

submission to the unwelcomed advances was an express or implied condition for receiving ongoing training. When asked, "[w]hat evidence do you have that it was because of some rejection from the female colleagues that the training and guidance ended?" Plaintiff answered, "[j]ust the way I felt about the situation. Seemed like coincident they went together." (Docket Entry No. 21-1 at p. 113). Moreover, Plaintiff does not assert that this was a "sexual advance" or a "request for sexual favors." Plaintiff stated that he felt uncomfortable during this incident for two reasons. First, because Elliot and Skinner were not adequately training him, but were interested in spending time talking about working out. (Docket Entry No. 21-1 at p. 104, p. 108 and p. 110[4]). Second, because Plaintiff had "an uncomfortable feeling" because he "[doesn't] touch people, period." Id. at p. 111. A sexual harassment plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* ... because of ... sex.'" Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998).

The Court concludes that Plaintiff has not carried his burden of proof. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts

---

[4]Q: So it was more they had treated you one way before that day and that day it was sort of totally different?
A: Yeah. Just like when I ask you for anything pertinent, there's no assistance. But now you want to touch me, grab my arm and laugh about working out and stuff.
Kind of really – I didn't like it.
(Docket Entry No. 21-1 at p.110).

showing that there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 256.

Moreover, for a sexual harassment claim under Title VII, Plaintiff's proof must show a "workplace [that] is permeated with 'discriminatory intimidation, ridicule, and insult,' and that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)).

For a hostile work environment claim under Title VII, the Plaintiff must establish more than a "mere utterance of an ... epithet which engenders offensive feelings in an employee," to be actionable. Harris, 510 U.S. at 21. As the Supreme Court explained:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Harris, 510 U.S. at 23.

To establish a prima facie case of sexual harassment under Title VII, the plaintiff must prove: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome sexual harassment; (3) that the harassment was based on his sex; (4) that the harassment created a hostile work environment; and (5) that the employer failed to take reasonable care to prevent or correct any sexually harassing behavior. See Bowman v. Shawnee State Univ., 220 F.3d 456, 462-63 (6th Cir. 2000) (affirming summary judgment despite proof of "a litany of perceived

slights and abuses," including sexually offensive language). To be actionable, sexual harassment must be sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment. Id. at 463.

Sexual harassment claims can be founded on either direct or indirect evidence. "'Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' It does not require the fact finder to draw any inferences to reach that conclusion." Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006) (quoting Kocak v. Cmty. Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005)). Plaintiff has not presented any direct evidence and states instead that "such cases generally require indirect evidence from which an inference of discrimination may be drawn." (Docket Entry No. 27, Plaintiff's Response, at 18).

Absent direct evidence, a Title VII claim is evaluated using the framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), that requires Plaintiff to establish "(1) [he] was a member of a protected class; (2) [he] suffered an adverse employment action; (3) [he] was qualified for the position; and (4) [he] was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees." Williams v. Zurz, 503 F. App'x. 367, 376 (6th Cir. 2012).

Plaintiff's proof cites only two incidents for his hostile work environment or sexual harassment claims. The harassing acts must be "either in concert or with a regularity that can reasonably be termed pervasive." Booker v. Budget Rent-A-Car Sys., 17 F.Supp.2d 735, 744 (M.D. Tenn. 1998) (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987)).

The two incidents alleged by Plaintiff were not "in concert;" one involved Elliot and Skinner and was based on Plaintiff's workout routine, and the other involved Cheatham and was based on a gay customer's comments. These incidents also did not occur with regularity; each incident occurred over the course of a single day and was not repeated.

Plaintiff's proof is his subjective reaction to the incidents, but Plaintiff must also prove that a reasonable person would consider the offensive conduct pervasive. Harris, 510 U.S. at 21-22. "Under the applicable standard, a reasonable person would not perceive this single remark as being so severe and extreme as to create an objectively hostile work environment. The remainder of [the] remarks, though unprofessional and perhaps subjectively hurtful, embarrassing, or offensive to [Plaintiff], are not actionable under [the law] because, as discussed above, they are not inherently sexual in nature." Kalich v. AT&T Mobility, LLC, 679 F.3d 464, 474 (6th Cir. 2012). The Court concludes that Plaintiff's proof does not satisfy the objective standard in Harris.

Plaintiff also argues that given the involvement of the supervisors, Life Credit Union is responsible for the incidents alleged herein. Because the Court concludes that Plaintiff has not proved sexual discrimination or harassment, consideration of Defendant's liability is moot.

As to Plaintiff's retaliation claim under Title VII, Plaintiff must show "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." Williams v. Gen. Motors Corp., 187 F.3d 553, 568 (6th

Cir. 1999) (citing Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987)). Plaintiff filed an EEOC complaint, but did not do so until April 25, 2013. (Docket Entry No. 21-6 at 5). Plaintiff was terminated on April 1, 2013. As such, an adverse employment action could not result from Plaintiff's exercise of his right. Plaintiff's retaliation claim fails.

For these reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 18) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this 30th day of September, 2015.

WILLIAM J. HAYNES, JR.
Senior United States District Court